ORIGINAL

FILED
JAN 2 2014
U.S. COURT OF
FEDERAL CLAIMS

UNITED STATES COURT OF FEDERAL CLAIMS

AL-JUTHOOR CONTRACTING COMPANY     CASE NO:

    Plaintiff,

vs.

UNITED STATES OF AMERICA,

    Defendant.

_____/

# COMPLAINT

Plaintiff, Al-Juthoor Contracting Company, through counsel, sues the United States of America for breach of contract, and states:

1. Al-Juthoor is an entity formed under the laws of the Republic of Iraq and has its principal place of business in Iraq.

2. Defendant is the United States of America through its subordinate agent, the U.S. Army Corps of Engineers ("USACE").

3. Jurisdiction is proper in this court pursuant to 28 U.S.C. § 1491 and the Contract Disputes Act of 1978 ("CDA"), 41 U.S.C. § 601 *et seq.*

4. This action is a timely appeal of a Contracting Officer's failure to make a decision within 60 days of the submission of a demand letter pursuant to Section 52.233-1(c) of the Federal Acquisition Regulations and 41 U.S.C. § 609(a)(1). Al-Juthoor sent its demand letter to USACE on July 26, 2013. The USACE Contracting Officer was required to respond no later than September 24, 2013. However, USACE failed to respond to Al-Juthoor's demand.[1]

5. This action pertains to the construction of a courthouse in Al-Karkh, Iraq pursuant to contract W916-QW-04-D-0014, Task Order 0004, which USACE awarded on September 18, 2004.[2]

---

[1] A copy of the July 26, 2013 demand letter is attached as Exhibit "1."
[2] A copy of the contract and the modifications are attached as Exhibit "2."

## Count I – Breach of Contract

6. Contract W916-QW-04-D-0014, Task Order 0004 memorialized the agreement between USACE and Al-Juthoor for the construction of the courthouse in Al-Karkh, Iraq.

7. USACE breached the contract by failing to pay Al-Juthoor for work Al-Juthoor performed in furtherance of the contract. USACE's breaches include:

   a. Failing to compensate Al-Juthoor for the costs incurred as a result of USACE issuing multiple notices to proceed;

   b. Failing to compensate Al-Juthoor for USACE's unilateral decision to change the location of the courthouse after Al-Juthoor had already completed the preparations for the original site location;

   c. Failing to compensate Al-Juthoor for the additional fill and foundation work needed for the second construction site;

   d. Failing to compensate Al-Juthoor for the delays incurred when USACE did not approve the security upgrade modifications that were mandated by the United States Marshals. USACE delayed approval for the mandated security modification for more than 120 days;

   e. Failing to compensate Al-Juthoor for the delays incurred when USACE did not approve the repair of military damage modification. USACE waited 167 days to approve Al-Juthoor's estimate to fix the damage caused by a United States Army patrol that assaulted the Courthouse because of faulty information that insurgents were using the courthouse as a staging area;

   f. Failing to coordinate with the Iraqi Ministry of Electricity to facilitate connecting the courthouse to the city's electrical grid. At the beginning of the project, USACE

directed that only it and the Gulf Regional Contracting office ("GRC") had the authority to directly contact the Iraqi Ministry of Electricity. USACE and GRC failed to timely coordinate with the Iraqi Ministry of Electricity, which resulted in Al-Juthoor being unable to continue its work at the courthouse for 365 days.

    g. Permitting the Iraqi Ministry of Justice to install its Force Protection Security Service to take up residence in the courthouse well before the structure was complete. The Ministry of Justice's security force displaced Al-Juthoor from its on-site offices, which resulted in Al-Juthoor obtaining an alternate office; repeatedly damaged the courthouse, which Al-Juthoor had to repair; and delayed Al-Juthoor's ability to complete and turn over the courthouse; and,

    h. Failing to coordinate a final inspection and turnover of the courthouse to the Iraqi Council of Judges. Only USACE and GRC could coordinate with Iraqi government agencies, but neither made any arrangements to get the Iraqi Council of Judges to accept the finished courthouse. For ten months, USACE required Al-Juthoor to maintain a construction maintenance staff to make repairs on the courthouse that occurred while USACE dallied in getting the Iraqi Council of Judges to accept the building. Al-Juthoor incurred additional expenses waiting for USACE to perform its obligations.

8. USACE's multiple breaches of the contract caused Al-Juthoor to incur damages in the amount of **$7,127,393.00**.

9. USACE's delays and decisions were not substantially justified. USACE and the GRC deliberately delayed approval of projects they directed Al-Juthoor complete. Additionally, USACE and the GRC deliberately delayed coordinating with the Iraqi Ministries of Electricity and Justice; as well as, the Iraqi Council of Judges to Al-Juthoor's detriment

because contract W916-QW-04-D-0014, Task Order 0004, could not be closed out in a timely manner.

10. All conditions precedent to this action have been performed, have occurred, or have been waived.

11. Al-Juthoor has retained counsel to represent it in this matter and has agreed to pay a reasonable fee for counsel's services. Al-Juthoor is entitled to recover its attorney's fees and the costs of this action.

## Supporting Allegations

### A. *Multiple Issuances of a Notice to Proceed*

12. USACE sent the first Notice to Proceed on April 14, 2005 in a letter from Elia Snell, the Contracting Officer for USACE's Gulf Region Division.

13. After receiving the April 14th Notice to Proceed, Al-Juthoor began mobilizing its workers and equipment in order to begin working on the courthouse project.

14. However, Al-Juthoor could not begin because USACE had not obtained the necessary clearances from the Iraqi government and the COJ.

15. On April 26, 2005, USACE issued the first modification to the contract to add the construction of a "safe house" in the vicinity of the courthouse.

16. USACE also sent the second Notice to Proceed to Al-Juthoor along with the modification. However, USACE had still not obtained the necessary clearance from the Iraqi government.

17. On May 21, 2005, the Iraqi COJ approved the commencement of work on the courthouse.

18. That same day, USACE sent the third Notice to Proceed to Al-Juthoor in a letter from Daniel Hanas, Contracting Officer.

19. USACE barred Al-Juthoor from directly obtaining the requisite authorizations from COJ. USACE caused this delay for which Al-Juthoor should be compensated.

20. At all times during this delay period, Al-Juthoor was fully mobilized to begin work as soon as USACE obtained the necessary permits from the COJ.

21. While waiting during this delay period, Al-Juthoor was unable to undertake any replacement or additional work.

22. For this claim, Al-Juthoor is entitled to a sum certain of **$682,860.00**.

    B. *Change of Building Footprint and Site Location*

23. The SOW required Al-Juthoor to conduct a complete site investigation and report its findings to USACE.

24. This survey cost $85,000 and was listed in line 8 of Al-Juthoor's original proposal.

25. After USACE sent the first Notice to Proceed, Al-Juthoor performed the site survey for the original location.

26. However, before the COJ gave its approval, USACE, in conjunction with COJ, directed that the courthouse be built on a different site.

27. The location change for the Courthouse construction site had three significant effects:

    a. First, the change of construction site meant a new site survey was required. This second site survey cost the same $85,000 as the original site survey.

    b. Second, as a result of the change in location and changes to the drawings the total size of the courthouse increased by 880 square meters, from the original 8560 square meters to 9440 square meters. Additionally, the second site required significantly more fill and grading to prepare for construction. The costs associated with the additional fill and brick work for both the courthouse and the annex were $1,490,766

    c. Third, Al-Juthoor had to create a new mobilization area for the new location.

28. The plain language of the SOW states that USACE would provide the mobilization area to Al-Juthoor. Instead of providing the mobilization area, USACE directed Al-Juthoor to obtain both the land and the necessary office facilities for the mobilization area.

29. Al-Juthoor obtained a new mobilization area at a cost of $5,000/month.

30. Al-Juthoor satisfied the condition precedent to obtaining relief for a change in site location because it provided written notice to the USACE contracting officer in the site survey submission. However, USACE responded with instructions to relocate the construction site.

31. For this claim, Al-Juthoor is entitled to a sum certain of **$1,869,038**.

C. *Delayed Approval of Security Upgrade Modification*

32. In December 2005, seven months into the construction of the Courthouse, USACE notified Al-Juthoor of a new requirement to upgrade the Courthouse's security measures.

33. The United States Marshals directed the security changes be implemented after they inspected the courthouse construction site in January 2006.

34. On February 23, 2006, USACE sent to Al-Juthoor a "tentative" SOW for the security upgrade, which was based upon input from Al-Juthoor.

35. USACE notified Al-Juthoor that the Gulf Regional Contracting office would have to approve the "tentative" SOW for security modifications before USACE could issue the "tentative" SOW as a Request for Proposal.

36. Al-Juthoor notified USACE that the proposed security modifications would have an adverse impact on the Courthouse's overall construction because certain portions of the Courthouse's construction could not progress until the proposed security modifications were installed.

37. Al-Juthoor informed USACE that the proposed upgrades would affect the false ceiling, the floors, walls, electrical and sanitary systems; as well as, the building's closed-circuit television system ("CCTV.")

38. However, Al-Juthoor stated that the adverse impact to the construction schedule could be mitigated if USACE quickly approved the necessary contract modification.

39. Despite Al-Juthoor's request to quickly approve the security contract modification, USACE waited until April 1, 2006 to first send out the initial Request for Proposal for the security modification.

40. Notably, the RFP requested Al-Juthoor submit its proposal no later than March 20, 2006.

41. Thus, the GRC made Al-Juthoor's performance impossible from the outset of the official period to plan, design, construct, and complete the security upgrades.

42. Although Al-Juthoor had already planned for the eventual award of the security modifications, the RFP specifically stated that it was not a Notice to Proceed; therefore, Al-Juthoor was not permitted to begin working on the security upgrades.

43. USACE's delay of nearly five months to create the initial RFP for security modifications adversely affected the courthouse construction schedule.

44. USACE's delay to issue the security modification resulted in construction delays to the false ceiling, ceramic floors and walls in sectors A and B; the painting of sectors A and B; the electrical, sanitary, and HVAC systems in sectors A and B; and the building's CCTV system.

45. Al-Juthoor notified the RCO of these delays on or about May 13, 2006.

46. On May 15, 2006, the RCO acknowledged the difficulties Al-Juthoor was experiencing as a result of the delayed award for the security modification.

47. USACE's agent and resident engineer, Roland Belew, stated that he would attempt to get part of the modification awarded by May 20, 2006 in order to get construction restarted.

48. On May 21, 2006 Belew notified Al-Juthoor that "an all inclusive [security upgrade] SOW" was forthcoming.

49. The actual Security RFP was finally issued on May 23, 2006, approximately five months after the need for these upgrades was first identified.

50. As a result of USACE's lengthy delay, the original cost estimate for the security modifications was out of date.

51. When Al-Juthoor submitted its updated cost estimate for the security upgrades, Al-Juthoor cautioned that the negotiations with its suppliers were not yet complete.

52. The updated estimated total cost to complete the security upgrade was $1,612,360.14.

53. Before actual work on the security upgrades could begin, personnel at USACE changed.

54. On June 14, 2006, Frank Walker ("Walker,") the replacement for Belew, flatly stated that Al-Juthoor's proposal was unacceptable because: a) the M-3 Jersey barriers were not correctly priced; and b) the Bill of Quantities continued to be "rewritten."

55. Walker demanded that the entire proposal be resubmitted.

56. Al-Juthoor responded with a revised cost submission that included and updated cost for Jersey barriers, the cost of installation, and the appropriate charges for overhead, administration, and fees. The revised proposal estimate totaled $2,752,142.05.

57. USACE and the GRC finally awarded the security upgrade modification to Al-Juthoor on July 1, 2006.

58. However, the contract award was only for $1,826,212.24 which was $925,929.81 less than Al-Juthoor's final estimate.

59. Al-Juthoor incurred costs that arose during the construction delay as a result of the RCO's delaying in developing the Security RFP, evaluating Al-Juthoor's cost estimate, and finally issuing the Security Modification.

60. During this delay period, AL-Juthoor was unable to continue working on the Courthouse and was unable to take on other work. Al-Juthoor had to maintain all of its crew and equipment because the security modification could have been approved at any time.

61. For this claim, Al-Juthoor is entitled to a sum certain of **$2,068,780.00**.

D. *Military Damage Modification Delay*

62. In August 2006, Al-Juthoor had substantially completed the Courthouse's construction, but awaited a pre-final inspection that was originally scheduled for November 15, 2006.

63. The pre-final inspection had to be postponed because of a friendly-fire incident at the Courthouse on November 2, 2006.

64. On November 2, 2006, a U.S. Army Stryker patrol was operating in the vicinity of the Courthouse. During the patrol, the Stryker unit engaged an enemy located in another building in a firefight, but the Stryker unit also fired into the Courthouse.

65. The Stryker unit's errant fire caused significant damage to the Courthouse.

66. After learning of the incident, USACE requested that Al-Juthoor prepare a cost estimate to repair the damage.

67. On November 13, 2006, Al-Juthoor submitted its preliminary cost estimate to USACE of $175,601.00 to repair the damage.

68. More than one month passed before USACE prepared and sent the RFP for the Stryker unit damage to Al-Juthoor.

69. The December 20, 2006 RFP for Stryker unit damage repair mirrored the proposal Al-Juthoor sent to USACE on November 13, 2006, but did not contain any cost figures.

70. On December 30, 2006, Al-Juthoor submitted to USACE the cost estimate for the Stryker unit damage repair.

71. On January 14, 2007, USACE responded to Al-Juthoor's cost estimate and unilaterally reduced the estimate by $58,000 to $117,508 without any explanation whatsoever.

72. USACE's January 14th response also omitted Al-Juthoor's profit and overhead that was contractually established at the inception of the contract.

73. On January 27, 2007, Al-Juthoor notified USACE that the proposed reduction to the cost estimate was unacceptable.

74. Then, on January 28, 2007, USACE cancelled the RFP for this repair.

75. USACE then asked Al-Juthoor for an updated project completion estimate.

76. However, the military damage repair affected the overall remaining work.

77. USACE put the military damage repair issue to the side until a fact-finding session regarding the cost of repair could be held on April 7, 2007.

78. On April 7, 2007, the GRC (the contracting office above USACE) referred the Stryker unit damage repair issue to Frank Kelly for action.

79. On April 8, 2007, Kelly immediately took the position that Al-Juthoor's cost estimate, which was originally submitted almost six months earlier, was inflated.

80. Also, Kelly questioned the authority of Al-Juthoor's representative, Charley Dublin, who had been Al-Juthoor's authorized representative since the beginning of the project.

81. Kelly demonstrated a complete lack of knowledge concerning the costs of materials in the Al-Karkh area, key personnel, and the terms of the contract.

82. Indeed, just three hours after his initial email in which he questioned the repair costs and Dublin's authority, Kelly admitted he had not read the contract terms.

83. On April 17, 2007, Al-Juthoor submitted a revised cost estimate to repair the military damage.

84. This estimate also incorporated the cost of increased security at the Courthouse because all of the materials needed to perform the repairs would be stored at the site.

85. Al-Juthoor's revised total estimated cost of repair was $331,200.72.

86. The GRC, through Kelly, responded that this estimate was still overpriced.

87. At no time did Kelly ever provide any documentation, competing proposal, or other evidence to support his challenge to Al-Juthoor's cost estimate.

88. After further negotiation with the GRC, Al-Juthoor accepted the government's offer to perform the military damage repair work for $250,000.

89. The contract modification for the Stryker unit damage repair was not issued until May 9, 2007, 167 days after the damage occurred.

90. Al-Juthoor could have completed the repairs in January 2007, at a lower cost; however, USACE and GRC would not authorize the repairs to proceed in the absence of a modification.

91. Neither USACE nor GRC ever explained the reason for the delayed approval.

92. Thus, the government's choice to delay the project resulted in Al-Juthoor's increased costs.

93. Furthermore, Kelly's arbitrary rejections of Al-Juthoor's estimate further delayed both the repair work and the overall construction.

94. At the time the military damage occurred, Al-Juthoor had already begun demobilizing in anticipation of the pre-final inspection. Al-Juthoor was forced to remobilize in order to perform the repairs called for in the modification.

95. For this claim, Al-Juthoor is entitled to recover **$409,488** for this delay.

E. *Ministry of Electricity Electrical Connection Delay*

96. Toward the end of principal construction, Al-Juthoor requested assistance from the GRC regarding the connection of the Courthouse's electricity to the city's main electrical grid.

97. Al-Juthoor designed and installed the building's electrical distribution system, but had no authority to connect the electrical system to the electrical grid.

98. Only USACE had the authority to coordinate with the Iraqi ministries; however they failed to do so and the electrical connection issue was not resolved for over one year.

99. Al-Juthoor formally notified USACE and GRC of a problem with the MOE in the "Problems Causing Delay" letter dated May 13, 2006.

100. The GRC responded that the contract required Al-Juthoor to perform all of the electrical connection work, including connecting the system to the area power grid.

101. However, the relevant clause of the SOW, Section 2.1.8 "Existing Electrical Power Distribution System" does not require Al-Juthoor to install either transformers or substations.

> The CONTRACTOR shall conduct a complete site investigation and field verify in order to fully research and document the electrical power distribution system. The CONTRACTOR shall map out all existing conditions to include the location and capacity of the existing in service Iraqi local sub-station. With this information, the CONTRACTOR shall provide a complete design illustrating all existing and proposed new work for the complete restoration of the facility's primary electrical power distribution system. The CONTRACTOR shall provide the primary electrical power distribution system in accordance with the International Electromechanical Commission. Construction shall not begin until approval by SPCO PROGRAM MANAGER. Upon approval of the design, the CONTRACTOR shall complete all work associated with the design in order to provide a comprehensive primary electrical power distribution system and the design process shall conform to the requirements outlined in SECTION 1, PARA 3.0: SUBMITTALS of this document.

102. This paragraph does not direct Al-Juthoor to construct transformers or substations. There is also no instruction for Al-Juthoor to connect the power system to the city electrical grid.

103. Paragraph 2.1.8 specifically tasked Al-Juthoor to design and perform the work to create the "facility's primary electrical power distribution system."

104. Four months later, in September 2006, Al-Juthoor met with representatives from GRC regarding the electricity connection and other issues.

105. According to the GRC, paragraph 2.1.8.1 definitively placed all responsibility on Al-Juthoor to connect the Courthouse to the Iraqi power grid. However, this section says nothing about coordinating with MOE.

106. Furthermore, nothing superseded USACE's directive to Al-Juthoor at the beginning of the project that it was not to directly contact the Iraqi government offices.

107. GRC and USACE's confusion about their responsibility for "coordination" with the MOE stymied efforts to get the Courthouse connected to the local utility grid.

108. Once the GRC finally contacted the "electrical" group of USACE, the process to get the Courthouse connected started.

109. The issue finally resolved once USACE coordinated with the MOE and Al-Juthoor engaged its local contacts for assistance.

110. During this period, USACE's failure to act delayed Al-Juthoor's construction efforts for 365 days. For this delay, Al-Juthoor is entitled to recover **$985,500**.

F. *Delays arising from the FPS guards repeated damage to the Courthouse*

111. On October 7, 2006, the PCO Program Manager Sundus Ali apparently directed that the Iraqi Ministry of Justice's Force Protection Security assume responsibility for the security of the courthouse.

112. Upon arrival, the FPS guards occupied the site and resided in the maintenance building.

113. Once in control of the construction site, the FPS guards prevented Al-Juthoor personnel from freely accessing the site and performing work.

114. The FPS guards presence caused significant upheaval to the construction project. Al-Juthoor was completely displaced and had to relocate its offices to FOB Blackhawk simply to continuing to work on the project.

115. The FPS guards significantly damaged the site, which caused Al-Juthoor to expend more labor and materials to repair the damage.

116. The SOW directed that only Al-Juthoor personnel would occupy the site and be responsible for its security.

117. USACE improperly modified the contract to Al-Juthoor's detriment when it directed the FPS to take up residence at the construction site and provide security.

118. The FPS guards' misuse and neglect of the construction site required Al-Juthoor to return numerous times to fix the damage.

119. For this claim, Al-Juthoor is entitled to recover the sum certain of **$699,567**.

### G. *The delay arising from the turnover and acceptance of the Courthouse by the COJ*

120. Although Al-Juthoor substantially completed construction of the Courthouse, the contract could not be closed out; in part because of the FPS guards' residence at the site and USACE's inability to determine a final inspection date.

121. Also, Al-Juthoor observed at a March 2007 meeting that USACE did not know who the Courthouse's end use would be and who could "sign-off" on the building.

122. The COJ finally accepted the completed Courthouse on December 17, 2007.

123. However, due to the various open items, unpaid invoices, unpaid adjustments, and similar failures by USACE and the GRC; the contract has not been closed out.

124. As recently as June 2012, USACE and Al-Juthoor were negotiating the possible closeout of the contract and the compensation owed to Al-Juthoor.

125. During the time that the Court was incrementally turned over to the COJ, USACE repeatedly required Al-Juthoor to return to the site return to the site to make repairs, clean the facility, and conduct site visits.

126. In order to be able to respond to USACE's requests, Al-Juthoor had to maintain its staff and some equipment.

127. For this claim, Al-Juthoor is entitled to recover the sum certain of **$412,160**, which resulted from the costs Al-Juthoor incurred.

## Conclusion

128. The government's inaction and indecision caused extensive delays for this project.

129. Al-Juthoor endured and overcame all of the challenges placed before it, but incurred significant unexpected costs.

130. In all, Al-Juthoor is entitled to recover the sum certain of $7,127,393 in full compensation for the changes, delays, interruptions, and extra repairs required to complete the contract.

WHEREFORE, Al-Juthoor requests the Court award damages in the amount of $7,127,393, appropriate interest, attorney's fees, and the costs of this action in full compensation for the delays, additional repairs, unpaid adjustments, and related failures by USACE and the GRC.

Dated: December 30, 2013                Respectfully Submitted,

_____
A. J. YOLOFSKY
ajyolofsky@kelleykronenberg.com
KELLEY KRONENBERG
1395 Brickell Ave., Suite 800
Miami FL 33131
(305) 503-0850; Fax: (305) 675-2917
*Counsel for Plaintiff, Al-Juthoor Contracting Company*